Howry, J.,
delivered the opinion of the court:
The claim is for salvage, alleged to have been paid on a recapture of the vessel by the British frigate R Unite. It is alleged .that the vessel was carried into the British island of Tortola, in the West Indies, and there condemned to the payment of ono-third the value of the vessel and cargo to the recaptors by the vice-admiralty court; that in default of such *15 payment the vessel and cargo were sold; that the vessel was purchased by the master for the benefit of the owners, but the cargo was sold in lots and purchased by the inhabitants of the island.
Copies of the alleged proceedings of the vice-admiralty court are not produced. The sole evidence is the record of a proceeding originating in the court of common pleas in Massachusetts upon an agreed statement of facts subsequently submitted to the Supreme Court of that State, by which it appears the insured brought suit against the underwriter, who disputed his insurance as for a total loss, alleging an average loss-only. (Storer v. Gray, 2 Mass. R., 565.) The question was whether an average or total loss was due, and the amount due. The insured recovered on the ground that the sale under the salvage decree operated to create such a change of property as to make the insurer liable for a total loss, deducting the amount recovered in the salvage case.
The agreed statement upon which the liability against France is rested is substantially covered by the following extract:
“That the said sloop, on the 15th day of January, A. D. 1800, set sail from Portland to Cape Franpois, and on the 17th day of February following, as she was proceeding on her voyage, was taken by a French privateer, the name and captain of which is unknown; that all the crew of the Margaret were taken out, except the master, a French crew put on' board, and the sloop ordered to a French port; that while the said sloop was in the possession of the French, property belonging to the crew was plundered; that after said sloop had been in the possession of the captors three days she was recaptured.”
Learned counsel say the question is Avhether the judicial proceeding shall be regarded as importing verity, or be presumed to have been a fictitious proceeding concocted for the purpose of securing the decision of the court on an imaginary question of law. It is assumed that the proceeding can not possibly be fictitious; that it must be accepted as true and sufficient to produce conviction.
Imaginary cases, however, have been presented to courts. One, celebrated in its day in Mississippi, is said to have been a fictitious proceeding, havingqits origin in the desire of some of the liar, without knowledge of the court, to obtain the coun *16 ter opinion of a great jurist upon the effect of the legality of a contract which oppugned the constitutional prohibition of a thing (no statute being in force prohibiting the doing of that thing by annexing penalties) as against the decision of the Supreme Court of the United States announcing views contrary to those previously expressed by Chief Justice Sharkey on the same subject. Brien v. Williamson, 7 How. (Miss.), 14.
Such isolated cases, however, only prove the possibility of their presentation. The proceeding in the Massachusetts court majr not have been for the purpose of deceiving anyone. It is not probable that any such intent existed; but inasmuch as neither the alleged captors nor the French Government were parties to the proceeding, France, of course, was not bound by the results at the time, nor are the United States now.
Even if we could concede the admissibility of the collateral proceeding in the Massachusetts court for an3r purpose, it is insufficient.
The proceeding derived no greater force or solemnity as against others than the agreement of the parties gave to it. It contains statements which the insured had no interest in denying. He was only concerned as to the loss. The agreement does not show whether the vessel was duly registered or whether she had on board the requisite documents; whether her papers were regular and complete, or whether she was pursuing a peaceful and legitimate voyage. The place of capture is not given, nor does it negative the vessel’s flight from the neutral’s right of search or resistance to it. Though the sufferers agreed that the vessel was taken by the crew of a privateer, the name and captain of the Frenchman is not even surmised. Under these circumstances it can not be presumed that the capture was without cause. Historically, the judicial proceeding might prove something, but there is not enough to predicate wrong in the capture. The French might be guiltless. The presumption is not against them.
It was a period of hostilities, flights, convoys, frauds, and violations of the neutrality laws, as well as a time of unwarranted aggression on the part of the French. The wrongs were not alwaji-s with the aggressors upon our commerce. They had rights as belligerents to protect themselves.
Nor did every vessel in the guise of a urivateer have the *17 authority of France to make seizures. In the history of spoli-ations upon the merchant marine others before and after Captain Kidd masqueraded as privateers, but plundered as pirates. That the cruiser capturing this sloop was piratical we do'not say, because there is no evidence of it. Neither is there evidence that she bore the commission of the French Government.
While it is not necessary to attempt to excuse a possible arbitrary seizure even if made by a French privateer cruising tinder the authority of that Government, a presumption does not arise on the facts presented sufficient to establish liability, and for these reasons there can be no recovery against the United States.
The facts will be reported to Congress, together with a copy of the conclusions of the court.